UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
ANNE M. MARCOUX, JILL LINDSAY, KIRSTEN
EVANS, CONSTANCE LaMATTINA, ELIZABETH
LEE PRICE, JUDITH ALEXANDER, DEBORAH
DEAN, CHRISTINA FORD, PATTI GENTRY, LaTONYA
K. GILLMORE, JANET GOLD, DALE HAGAR, JULIE
HORAN, LOUIS HORTER, CAROL JOHNSON, MOLLY
KAIMAN, BEVERLEY KALKHOF, NANCYANNE
KELLO, PATRICIA KENNEDY, JANET KIRBY, JOHN
KLINE, DOTTIE LONG, KAREN RIVOIRA,
LAURENCE E. SALOMON III, DANIEL SANTIAGO,
REBECCA SMITH, and DEBORAH WHITTINGTON
on Behalf of themselves and all others similarly situated
(i.e., the "Class"); CONSTANCE LaMATTINA also on
behalf of Subclass I, KIRSTEN EVANS, JILL LINDSAY
and ELIZABETH LEE PRICE also on Behalf of Subclass
II; DEBORAH WHITTINGTON also on Behalf of
Subclass III, and JANET KIRBY also on Behalf of
Subclass IV,

**OPINION & ORDER**
**04 CV 1376 (NG)(KAM)**
**03 CV 4987 (NG)(KAM)**
**04 CV 634 (NG)(KAM)**

        **Plaintiffs,**

  **- against -**

AMERICAN AIRLINES, INC., A.M.R. CORPORATION,
ASSOCIATION OF PROFESSIONAL FLIGHT
ATTENDANTS, and JOHN WARD, as President of
Association of Professional Flight Attendants,

        **Defendants.**
-------------------------------------------------------------------------x
**GERSHON, United States District Judge:**

       This action is one in a series of lawsuits arising out of defendant American Airlines Inc.'s

("American's") 2003 reorganization and the activities surrounding the negotiation and ratification

of the subsequent concessionary agreements with American's employees' unions. Plaintiffs are

"former and retired employees of American, members of the defendant union, the Association of

Professional Flight Attendants ("APFA"), and current or former members of APFA's Bargaining

1

Unit." Plaintiffs' First Amended Consolidated Class Action Complaint, ¶ 6 ("Amended Complaint"). They bring this action to set aside what they characterize as an "unlawful and unratified agreement between American Airlines and the labor union representing its flight attendants . . . ." Amended Complaint ¶ 1. Plaintiffs originally filed three related actions in this court, *Ford v. Association of Professional Flight Attendants, et al.* 03-CV-4987, *Lindsay v. Association of Professional Flight Attendants,* 04-CV-634, and *Marcoux v. American Airlines, Inc.*, 04-CV-1376. The actions were consolidated, and plaintiffs filed the Consolidated Class Action Complaint on July 12, 2004, and amended it on November 30, 2004. Plaintiffs, who have not yet moved for class certification, identify four subclasses: (1) members of APFA who were entitled to vote on the ratification question, (2) members of APFA who voted in opposition to ratification, (3) members of the class who were furloughed, and (4) members of the class who have retired since the time of the alleged wrongdoing. Unless noted otherwise, plaintiffs' claims are brought on behalf of the class and all subclasses.

In addition to claims against American, the Amended Complaint asserts claims against American's parent company, AMR Corporation ("AMR") (jointly, the "Company Defendants"), as well as claims against APFA and its then-President, John Ward (jointly, the "Union Defendants"). In twenty-two Counts, plaintiffs allege violations of the Railway Labor Act, 45 U.S.C. §§ 151 *et seq.* ("RLA"), and the duty of fair representation ("DFR"), as well as violations of the Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 401 *et seq.* ("LMRDA"), the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), and state common law.

Company Defendants move to dismiss all of plaintiffs' state claims as preempted by federal law. Union Defendants move to dismiss some of plaintiffs' claims under the LMRDA. All defendants move to dismiss plaintiffs' claims alleging violations of RICO.

## BACKGROUND

The allegations in the Amended Complaint, described below, are taken as true for the purposes of defendants' motions to dismiss.[1]

Prior to May 1, 2003, the terms and conditions of plaintiffs' employment were governed by a collective bargaining agreement that had been in effect since November 1, 1998 (the "1998 Agreement"). The 1998 Agreement was duly ratified by union members and was implemented in accordance with the RLA. The amendable date—the earliest time that either party could require the other to enter into negotiations to modify the agreement—for the 1998 Agreement was November 30, 2004. Notwithstanding this date, American approached APFA in or around December 2002 to begin to negotiate voluntary concessions from the flight attendants. American communicated to APFA that it had been experiencing a steady financial decline that was exacerbated by the terrorist attacks on September 11, 2001. Citing a fragile economy, problems in the airline industry, and a large drop in air travel, American asked APFA if it would voluntarily roll back flight attendant pay increases of three percent (3%) that were scheduled for 2003. Shortly thereafter, American announced that it would need "permanent" labor cost savings of $1.8 billion per year, of which

---

[1] Plaintiffs have not contested the Company Defendants having attached various documents, such as the Restructuring Participation Agreement and the union's constitution, which are referred to in the Amended Complaint, to their motion. The attachment of such documents does not convert this motion to one for summary judgment. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir. 2002). In any event, it was unnecessary to rely on anything other than the Amended Complaint itself in resolving the motions.

APFA members were expected to contribute $340 million, through a collectively bargained mid-term agreement, called the Restructuring Participation Agreement ("RPA"). American further represented that, to avoid bankruptcy—which carried an additional loss of $130 million in cost savings and the furlough of 2,500 more flight attendants than originally contemplated in the initial spending cuts—APFA would need to enter into the RPA with American by March 31, 2003. This deadline was later extended to April 15, 2003.

APFA's constitution requires collective bargaining agreements to be ratified by the membership. The Negotiating Committee presents the proposed agreement to the Executive Committee. If the Executive Committee accepts the agreement, it is presented to the membership for ratification. However, if the Executive Committee rejects the proposed agreement, the Negotiating Committee may present it to the Board of Directors, which has the power to override the Executive Committee's rejection and submit the proposed agreement to the membership for approval. In either event, the membership is entitled to take at least 30 days prior to voting to consider the agreement. The APFA constitution also provides for secret, mail-in, paper balloting and requires that the membership receive the complete changes to any proposed collective bargaining agreement prior to or at the start of the balloting period. An agreement is ratified and thus binding upon the membership once a majority of members in good standing vote in favor of ratification.

To meet American's April 15, 2003 deadline, APFA's Board of Directors passed a resolution on March 19, 2003, suspending the 30-day consideration period prior to the commencement of balloting and permitting the use of electronic ballots. On March 31, 2003, APFA's Negotiating Committee reached agreement with American on the final terms of the RPA, and the Executive

Committee recommended presenting it to the APFA membership for ratification. The balloting was scheduled to begin the first week of April, and end on April 15, 2003.

Throughout the balloting period, APFA maintained a hotline that broadcast various messages purporting to provide updated information to the membership. Plaintiffs allege that these recorded messages served only to present false and misleading information to the APFA members regarding American's economic forecast and to pressure APFA members into ratifying the RPA by stating, among other things, that if the membership rejected the proposal, negotiations would be discontinued. Plaintiffs also suggest that APFA misrepresented its position regarding the members' ability to change their votes by stating that "[APFA] determined that it would be most in keeping with APFA's normal, prescribed voting procedures to not allow a member to change their vote." In fact, as discussed below, APFA members were permitted to change their votes during the one-day extension of voting.

Plaintiffs also allege that defendants engaged in additional activities to induce APFA members to ratify the RPA. Plaintiffs assert that defendants knew that the membership had voted to reject the RPA on April 14th and sought to exert "undue pressure and scare tactics" to get individuals who had not voted to cast ballots in favor of the RPA before the deadline. For example, defendants, among other things, called flight attendants and suggested that, if the RPA were rejected, American would declare bankruptcy; and they held "impromptu" meetings at airports to garner support for the RPA. Plaintiffs assert that these pressure tactics were targeted specifically to those flight attendants that American and APFA knew had not yet voted. Despite these efforts, on April 15, 2003, the APFA membership voted to reject the RPA, with the final tally being 9,842 against

ratifying the RPA, and 9,309 for ratifying the RPA. Subsequently, American and APFA agreed to extend the voting until April 16, 2003.

During the additional day of voting, APFA allowed members who had previously voted to change their votes. Plaintiffs assert that the second round of voting was tainted by illegal electioneering practices which were initiated by American and willfully ignored by APFA. These practices included American and APFA, both subtly and overtly, creating a "frenzy" and "sheer panic" among APFA members by suggesting that American would declare bankruptcy if the RPA were rejected. Defendants' objectionable conduct included placing "pop-up" notices supporting ratification on the flight services' website and providing money or a "minor gratuity" to flight attendants who had voted "No" to ratification in exchange for their changing their votes to "Yes." As a result of these efforts, 1,262 votes were cast, and the membership ratified the RPA, with the final tally being 10,761 votes in favor of ratifying the RPA, and 9,652 votes opposing ratification.

On or around April 17, 2003, it was revealed that American had, despite its precarious financial position, established a Supplemental Executive Retirement Program for its top 45 executives and cash retention bonuses for its top six executives. Upon learning of the bonus programs, defendant John Ward immediately sent a letter to American demanding that the APFA membership be given a "fresh opportunity to vote on the proposed terms of the restructuring agreement in an untainted environment." Shortly thereafter, Ward sent another letter asserting that American's "material breach of its obligation to disclose all relevant information" necessitated a re-balloting. APFA's Board of Directors formalized this request by passing a resolution on April 22, 2003, directing APFA's National Ballot Committee to conduct a re-ballot.

On or around April 23, 2003, APFA and American began negotiating additional terms to the RPA. The resulting provisions shortened the life of the RPA by eight months, made the collective bargaining agreement amendable in three years, allowed pay increases in the event that American became financially viable and granted the right to substitute another concession in exchange for reinstating a previously-surrendered concession relating to the calculation of flight attendants' salaries. These additional terms, which John Ward maintained were still a "tremendous sacrifice" on APFA's behalf, were added to the RPA on April 25, 2003 by way of a letter agreement which purported to "resolve all disputes" concerning the negotiation, ratification, and effectiveness of the RPA.

The Amended Complaint contains other allegations directed expressly to the RICO claims. These will be addressed below.

## DISCUSSION

All defendants having answered, they move, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment on the pleadings dismissing certain claims in the Amended Complaint. A motion for judgment on the pleadings under Rule 12(c) is reviewed under the same standard as a Rule 12(b)(6) motion to dismiss. *Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir. 1999). That is, the motion should be granted only where it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d. Cir. 1998). Plaintiffs' factual allegations must be accepted as true, *Zinermon v. Burch*, 494 U.S. 113, 118 (1990), and the court must draw all inferences in favor of plaintiffs. *Thomas v. City of New York,* 143 F.3d. 31, 37 (2d Cir. 1998).

**A.  State Law Claims**

In addition to their claims under the RLA and the DFR, plaintiffs, relying on the same factual allegations which form the bases of their RLA and DFR claims, assert nine state common law claims.  American or the Company Defendants move to dismiss the eight claims directed against them.[2]  Count Ten alleges that American breached individual employer contracts with its employees by interfering with their rights under RLA Section 2, Third and Fourth**,** to designate and be represented by bargaining representatives of their choice.  *See* 45 U.S.C. § 152, Third and Fourth. Counts Twelve and Sixteen allege that the Company Defendants intentionally interfered with contractual relations between APFA and its members by causing APFA to breach certain provisions of its constitution and bylaws relating to balloting and electioneering practices.  Counts Seventeen and Eighteen assert breach of implied contract claims against the Company Defendants based on an implied duty not to interfere with internal union balloting.  Counts Nineteen and Twenty assert unjust enrichment claims against the Company Defendants for allegedly wrongful conduct in obtaining APFA members' approval of the RPA.  Finally, Count Twenty alleges that the Company Defendants engaged in fraud and misrepresentation during the RPA negotiations by falsely communicating that American was on the verge of bankruptcy and by failing to disclose material facts relating to its financial state.  Like plaintiffs' claims under the RLA and the DFR, all of these state law claims arise out of occurrences during the negotiation and ratification of the collectively bargained RPA.  The Company Defendants argue that they are therefore preempted by federal law.

---

[2]  Count Eleven, brought on behalf of members of the class who were entitled to vote on ratification, alleges that APFA breached a contract (the APFA constitution) with its members by engaging in unlawful balloting and negotiating activity.  APFA has not moved to dismiss this claim.

The RLA provides a comprehensive federal regulatory scheme for the resolution of disputes in the rail and air transportation industries. Specifically, the RLA governs the process of negotiation of "agreements concerning rates of pay, rules and working conditions" between carriers and their employees. 45 U.S.C. §§ 152, 156. It protects the right of employees to designate the bargaining representative of their choosing and imposes obligations on carriers and unions with respect to the negotiation of agreements and the settlement of disputes. *See* 45 U.S.C. § 152. Under the RLA, disputes between labor and management are categorized as either "major" or "minor". *See Consolidated Rail Corp. v. Railway Labor Exec. Ass'n., et al.,* 491 U.S. 299, 302 (1989) ("*Conrail*"). "Major" disputes seek to create contractual rights; they involve disputes arising out of the formation of collective bargaining agreements or efforts to secure such agreements. *See id.*; 45 U.S.C. §§ 152, Seventh and 156.[3] This category of disputes looks to the "acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945). Major disputes arise only when there is no existing collective bargaining agreement in place or where a party seeks to change the terms of an existing agreement, in effect, formally creating a new agreement. In the event of a major dispute, the RLA requires the parties to undergo a lengthy process of bargaining and mediation. *See Conrail*, 491 U.S. at 302-3. If the bargaining and mediation fails, the parties are encouraged to submit to arbitration. *Id.*

The parties to "minor" disputes, on the other hand, seek to enforce contractual rights arising out of an existing collective bargaining agreement. *See Conrail*, 491 U.S. at 303. Labor disputes are deemed minor disputes if they arise or grow out of "grievances or out of the interpretation and

---

[3] Section 2, Seventh states that no carrier "shall change the rates of pay, rules, or working conditions of its employees...except in the manner prescribed in such agreements," or through the mediation procedures established in Section 6.

application of agreements concerning rates of pay, rules or working conditions." *Id.*; *see also Hawaiian Airlines Inc. v. Norris,* 512 U.S. 246, 252-53 (1994) (*"Hawaiian Airlines"*). Under the RLA, parties to minor disputes are required to submit to "compulsory and binding arbitration before the National Railroad Adjustment Board" or "before an adjustment board established by the employer and the unions representing the employees." *See Conrail*, 491 U.S. at 303-4. The adjustment boards have exclusive jurisdiction over minor disputes, and judicial review of any arbitral decision is limited. *See id.* at 304.

Here, plaintiffs' state law claims attack Company Defendants' conduct while negotiating and pursuing ratification of the collectively bargained RPA. While couched in state law terminology, all of these claims rely on the identical factual allegations supporting the RLA claims and therefore are "major" disputes under the RLA. Under the preemption doctrine set forth in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), state law claims are presumptively preempted if they concern conduct that is actually or arguably either prohibited or protected by federal labor law. *See Belknap v. Hale*, 463 U.S. 491, 498 (1983). Although *Garmon* preemption first arose in the context of the National Labor Relations Act ("NLRA"), and *Garmon* itself concerned the primary jurisdiction of the National Labor Relations Board ("NLRB"), the *Garmon* preemption doctrine has been extended to conduct governed by the RLA. *See Broth. of R.R. Trainmen v. Jacksonville Terminal Co.*, 394 U.S. at 369, 383-84 & n.19 (applying *Garmon* preemption principles while noting that "[t]here is … no administrative agency equivalent to the NLRB with jurisdiction over railway labor disputes"). Thus, state claims that attempt to regulate conduct protected or prohibited by the RLA are preempted. In the RLA context, as in cases arising under Section 301 of the Labor Management Relations Act, 1947, ("LMRA"), as amended, 29

U.S.C. §§ 141 *et seq.*, preemption is driven by the need for uniform federal regulation of labor-management relations. *See Peterson v. Air Line Pilots Ass'n*, 759 F.2d 1161, 1169 (4th Cir. 1985) (finding that "the risk of state interference with the effective administration of national labor policy is present [in the RLA context] even though the exclusive jurisdiction of the arbitrator is not at issue"); *cf. Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985) (noting, in a Section 301 case, that interests in interpretive uniformity and predictability require that labor-contract disputes be resolved by reference to federal law).

In this case, there is no dispute that American owed plaintiffs certain statutory duties under the RLA and that APFA had a duty of fair representation with respect to plaintiffs.[4] There is also no dispute that, under the RLA, hybrid DFR claims may be asserted against an employer and that such claims are governed by federal law. *See Czosek v. O'Mara*, 397 U.S. 25, 29-30 (1970). Counts One through Nine in the Amended Complaint, which defendants do not move to dismiss, allege RLA and DFR or hybrid DFR violations based on all defendants' conduct during the negotiation for and ratification of the RPA. For example, plaintiffs challenge defendants' actions in "extending the balloting to April 16, 2003," "denying the flight attendants the opportunity to cast their ballots in a calm atmosphere," "deliberately creating a firestorm of fear and frenzy," and "failing to assure the

---

[4] The duty of fair representation, although not an explicit statutory requirement, has been fashioned judicially as a corollary to "the exclusive agent's statutory authority to represent all members of a designated unit" and requires the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 74-77; *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). Because federal labor law defines the scope of the duty of fair representation a union owes to its members, state law claims that are "mere refinements" of the duty of fair representation also are preempted. *See Peterson*, 759 F.2d at 1170.

integrity of the balloting process and the accuracy of any tallies." Plaintiffs' state law claims assert common law theories based on identical conduct.

*Garmon* carved out two narrow exceptions to the preemption doctrine which recognize that major disputes are not preempted where state regulation of conduct "deeply rooted in local feeling and responsibility" or matters of "merely peripheral concern" to federal labor relations law are at stake. *Garmon*, 359 U.S. at 243-44. These exceptions highlight the court's responsibility "to determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." *Farmer v. United Broth. of Carpenters and Joiners of America, Local 25 et al.,* 430 U.S. 290, 297 (1977). Here, none of the challenged state law claims falls within either exception. Rather, each goes to the heart of the federal interest in ensuring the fair and orderly negotiation of working conditions by carriers and employees. The interests asserted by the plaintiffs are precisely those protected by federal labor law, not interests "deeply rooted in local feeling and responsibility." *See Bensel v. Allied Pilots Ass'n.*, 387 F.3d 298, 321-32 (3d Cir. 2004). "Far from being of only 'peripheral concern' to federal labor law, plaintiffs' state law claims strike at the core of conduct and relationships governed" by the RLA. *Cooper v. TWA Airlines, LLC,* 349 F.Supp.2d 496, 506 (E.D.N.Y. 2003).

Plaintiffs attempt to avoid preemption as to some of their state law claims by arguing that they do not arise from the effort to achieve a collectively bargained agreement, but rather arise from the breach of separate, individual contracts. Plaintiffs claim the existence of two types of independent contractual obligations. Count Twelve —which is alleged only on behalf of members of the class who were entitled to vote on ratification— and Count Sixteen assert that the Company Defendants interfered with the plaintiffs' contractual relations with APFA as set forth in the union's

constitution and bylaws. Counts Ten, Seventeen and Eighteen rely on the RLA itself. In Count Ten, plaintiffs argue that, since Section 2, Eighth of the RLA provides that the Third, Fourth, and Fifth paragraphs of Section 2, are part of the contract of employment between the carrier and each employee, "to the extent that American has violated Section 2, Third and Fourth of the RLA, it has also violated its contracts of employment."[5] Counts Seventeen and Eighteen allege breaches of implied contracts between the Company Defendants and the flight attendants not to interfere with union balloting procedures. On oral argument, plaintiffs acknowledged that these implied contracts also arise solely from obligations imposed on the carrier under the RLA.

First, as discussed earlier, plaintiffs are alleging major disputes as all of these claims deal explicitly with alleged misconduct by American or the Company Defendants during the negotiation and ratification of the RPA, and these claims are in essence no different from their RLA and hybrid DFR claims.[6] Second, plaintiffs' allegations do not amount to claims of individualized contracts protected by state law. The rights set forth in the RLA, which plaintiffs allege create implied

---

[5]  Section 2, Third provides, in relevant part, that " [r]epresentatives ... shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives . . . ."  45 U.S.C. § 152, Third.

 Section 2, Fourth provides, in relevant part, that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing ... no carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize or assist in organizing the labor organization of their choice . . . ." 45 U.S.C. § 152, Fourth.

[6]  Counts Twelve and Sixteen assert in effect hybrid RLA/DFR claims against American and, just like the other state law claims against the Company Defendants, are predicated on conduct surrounding the negotiation and ratification of the RPA. The hybrid RLA/DFR claims against American are, therefore, major disputes that are preempted under *Garmon. See Cooper v. TWA Airlines, LLC*, 274 F.Supp.2d 231, 248-49 (E.D.N.Y. 2003); *Cooper v. TWA Airlines, LLC,* 2005 WL 3863435 (E.D.N.Y. July 18, 2005).

individual contracts, are governed by federal law and are rights that employees have during the course of their effort to obtain a collectively bargained agreement. Such rights are wholly within the purview of the RLA, and thus any state law claims alleging violations of those rights are assuredly preempted.

Plaintiffs' reliance on *Hawaiian Airlines* to argue that these so-called individual claims should be viewed as not subject to preemption obfuscates the difference between federal preemption over major disputes under the RLA, which is at issue here, and federal preemption of disputes regarding the interpretation of collectively bargained agreements, which is not at issue, but was the subject of *Hawaiian Airlines*. The defendant in *Hawaiian Airlines* argued that the plaintiff's claim under a state whistleblower statute could be heard only by the RLA's arbitral boards and thus was preempted. The Supreme Court disagreed on the grounds that the only source of the claimed rights was state law and not the collectively bargained agreement and that interpretation of the collectively bargained agreement was not required. In essence, the state law claims were not minor disputes and therefore could proceed in state court. Nothing in the Supreme Court's decision suggests that major disputes regarding the negotiation and ratification of collectively bargained agreements can be heard as state law claims.[7]

---

[7] Plaintiffs' reliance on *Sullivan v. American Airlines*, 424 F.3d 267 (2d Cir. 2005), is also misplaced. There, the Court of Appeals for the Second Circuit recognized that, under *Hawaiian Airlines*, state law claims that are disguised minor disputes are preempted by the RLA. *Sullivan,* 424 F.3d at 273. *Sullivan* held, however, that, even where state law claims qualify as minor disputes under the RLA, and even though a defendant can assert preemption in the state court as a defense, the misnamed jurisdictional doctrine of "complete preemption" does not create federal jurisdiction authorizing removal of the action from state court to federal court. *Sullivan* provides no support for plaintiffs' position here.

In sum, the eight state law claims against American or the Company Defendants are dismissed as preempted by federal law.

## B. **LMRDA Claims**

Counts Thirteen, Fourteen and Fifteen assert claims under Section 411 of the LMRDA, 29 U.S.C. §§ 411(a)(1), which provides that:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

Defendants seek dismissal of Counts Fourteen and Fifteen, and parts of Count Thirteen, on the ground that the court lacks jurisdiction to hear the claims.

In *Members for a Better Union v. Bevona*, 152 F.3d 58 (2d. Cir. 1998), the Court of Appeals for the Second Circuit held that there is no jurisdiction unless the "specific allegations in the complaint reflect an infringement of rights protected under Title I of the LMRDA." In *Bevona,* union members sought to enjoin certain voting procedures mandated by the union leadership regarding a vote on proposed amendments to the union's constitution. Specifically, plaintiffs charged that the union wrongfully refused to publish the proposed amendments in the union newspaper, scheduled the vote at times that did not accommodate all employment shifts, and published the executive committee's negative recommendation in the union newspaper without giving plaintiffs the opportunity to present an opposing view. The Court found that, although the union's actions may have dissuaded some members from voting, there was no discriminatory denial because the "same detriments applied equally to the class." *Id.* at 65. Under *Bevona*, then, mere

allegations of unfairness do not state a claim under Section 411(a)(1).  Rather, to be within the court's jurisdiction under that Section, plaintiffs' claims must allege that APFA granted rights to some of its members, but denied those same rights to others, in order to carry out a discriminatory goal.

Plaintiffs have satisfied the jurisdictional threshold with respect to the claim alleged in Count Thirteen.[8]  Defendants do not dispute that the language of paragraph 312 of Count Thirteen, which alleges that "[t]he Union violated 29 U.S.C. § 411 by permitting members to change their votes from 'No' to 'Yes,' but not vice versa," meets the *Bevona* test.  Defendants  recognize that this allegation meets the jurisdictional prerequisite because it pleads that the union favored certain of its members (those voting in opposition to ratification), by granting them the right to change their vote to "yes," but denied that same right to those who had voted in favor of ratification and wanted to change their votes to "no."  In essence,  this alleged denial of voting rights sought to ensure ratification of the RPA, by discriminating against those employees in opposition to ratification.

Defendants nonetheless ask the court to treat the allegations of Count Thirteen as three separate claims in order to obtain dismissal of the other two "claims," namely, paragraph 310, which alleges that APFA "violated 29 U.S.C.  § 411 by reopening a vote that was already officially closed so that there could be no extended voting," and paragraph 311 which alleges that APFA permitted members to change their votes during the extension period.  Defendants' application to dismiss individual sentences within Count Thirteen is denied.  A claim is not to be dissected sentence by

---

[8]  Count Thirteen is alleged only on behalf of members of the class who cast ballots in opposition to ratification.

sentence. It is enough, at this stage of the litigation, that Count Thirteen, as noted above, states a claim under the LMRDA.

Count Fourteen alleges, on behalf of members of the class who voted in opposition to ratification, that the Union Defendants improperly used the National Balloting Committee's resources to distribute only information in support of ratification, and thereby denied those opposed to ratification the same privileges enjoyed by the "yes" voters. The Second Circuit rejected a similar argument in *Bevona*—where the union had refused to publish opposing views in the union newspaper—on the ground that, even though the information provided to the membership was one-sided, all of the membership received it. Therefore, the court held, no individual was granted rights or information that was discriminatorily denied to others. *See Bevona*, 152 F.3d at 58.

Finally, Count Fifteen alleges, on behalf of all members entitled to vote on the ratification question, that APFA wrongfully dispensed with the membership's vote by "substituting" for it the Board of Directors' vote, thereby effectively denying to the union members their rights and privileges as voting members of the union. Plaintiffs urge the court to consider this claim in light of *Smith v. Bowers*, 337 F.Supp.2d 576 (S.D.N.Y. 2004). There, the ballots of three local unions were disqualified after the locals allowed their members to vote after the time that was designated by union leadership to end balloting. Although the votes of these locals were originally counted in the national totals, the national leadership disqualified the votes. The Court held that, under *Bevona*, the jurisdictional threshold was met because plaintiffs undisputedly alleged disparate treatment by the national union leadership, in that the votes of certain of the unions' members (those who voted before the end of balloting) were counted, while others (those of the three locals) were not. *Id.* at 588. In contrast, here, no such disparate treatment within the voting class is alleged. Rather, since

the alleged denial of voting rights extended across the entire membership, regardless of whether members voted for or against ratification of the RPA, no members were granted any greater or lesser privileges than others. *See Local Union 20, et al. v. United Broth. of Carpenters and Joiners of America, et al.*, 223 F.Supp.2d 491, 498 (S.D.N.Y. 2002).

In sum, the court has jurisdiction over Count Thirteen, but not over Counts Fourteen and Fifteen, and Counts Fourteen and Fifteen are dismissed.

## C. **RICO Claims**

In Count Twenty-two, plaintiffs assert as to all defendants both a substantive violation of 18 U.S.C. § 1962(c) and a conspiracy, under 18 U.S.C. § 1962(d), to violate Section 1962(c). 18 U.S.C. § 1962(c) makes it unlawful, in relevant part,

> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

RICO defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *See* 18 U.S.C. § 1961(4). Plaintiffs must allege a pattern of "racketeering activity" consisting of "at least two predicate acts . . . which amount to or pose a threat of continued criminal activity." *First Capital Asset Mgmt.*, *Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d. Cir. 2004). "Racketeering activity" is defined to include "any act which is indictable under" 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1951 (the Hobbs Act), 18 U.S.C. § 1952 (the Travel Act), and 29 U.S.C. § 186 (restrictions on payments and loans to labor organizations). *See* 18 U.S.C. 1961(b). Under the mail and wire fraud statutes, "any scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," which

involves use of the mails or wire is indictable.  *See* 18 U.S.C. §§ 1341, 1343.  Plaintiffs here rely upon allegations of thousands of acts said to violate the aforementioned statutes.  Defendants principally argue that, despite the number of alleged predicate acts, plaintiffs fail to plead the required pattern of racketeering.

In the Amended Complaint, plaintiffs greatly expand their original RICO claims. They allege that, beginning as early as December of 2002 and continuing through at least September of 2004, American and APFA formed an association-in-fact for the dual purposes of (1) devising and carrying out a scheme to fraudulently induce American's flight attendants to enter into the RPA and (2) devising and implementing the strategy allowing the APFA Board of Directors to substitute its own approval of the RPA for the decision of the APFA membership.  Plaintiffs categorize defendants' alleged wrongful activity in furtherance of these plans into four "implementing schemes."  As with the facts discussed above, any additional allegations described below are taken as true for purposes of the pending motions.

First Implementing Scheme

In mid-February 2003, American sought to scare APFA members into voluntarily relinquishing current wages and benefits packages by falsely asserting that American was suffering from a financial crisis arising, in part, from labor costs. Specifically, plaintiffs allege,  APFA endorsed American's false statements, even though they had access to American's books and records, which should have indicated that American's economic outlook was more positive than previously communicated.  Plaintiffs also allege that APFA  reiterated American's false representations to the membership, with knowledge that the representations were false.  Each telephonic message, union publication, and/or American publication that contained the allegedly

false representations, and was communicated via mail or wire to the APFA members, is alleged as a separate predicate act under RICO.

Second Implementing Scheme

From April 15 to April 16, 2003, American and APFA allegedly used "coercion, vote rigging and, ultimately diktat or decree" to aggressively pursue votes in favor of ratification during the one-day extension of voting on the RPA ratification question. Specifically, plaintiffs assert that American and APFA formed "get-out-the-vote" squads to aggressively pressure members either to vote in favor of ratification or, if they had already voted "no," to change their votes to "yes." Plaintiffs also allege that American and APFA had insider knowledge as to whether and how members had voted on the ratification question. Plaintiffs contend that this alleged coercion and extortion violated the Hobbs and Travel Acts and, therefore, are predicate acts under RICO. Plaintiffs also allege that American, in effect, paid certain flight attendants a "gratuity" to vote, or arranged or paid for them to call in their vote to the American Arbitration Association, in violation of 29 U.S.C. § 186, with each payment constituting a predicate act under RICO.

Defendants are also charged with meeting, via telephone conference, between April 22 and April 23 of 2003, to devise and implement the strategy of causing APFA's Board of Directors to usurp the flight attendants' power to hold another vote on the ratification question. Plaintiffs claim that, when John Ward executed the letter agreement between American and APFA, the defendants effectively eliminated the members' opportunity to hold another vote regarding the proposed RPA. Plaintiffs allege that defendants violated the mail and wire fraud statutes by posting the Board of Director's resolution (which was in furtherance of the substitution scheme) on APFA's website and subsequently mailing it to the APFA membership.

<u>Third Implementing Scheme</u>

Defendants allegedly sought to continue the life of the RPA by ensuring that individuals associated with the "Ward Regime" remained in office. To this end, APFA and John Ward worked together to engage in deception and vote manipulation to re-elect Ward as President in the APFA election scheduled to occur on January 29, 2004. After a runoff between the final two candidates, John Ward and Tommie Hutto-Blake, APFA announced that Ward had won the election by five votes. However, in approximately mid-August of 2004, after investigating and reinstating certain disqualified votes, the Department of Labor determined that Tommie Hutto-Blake had actually won the January 29, 2004 election. APFA subsequently installed her as President. Plaintiffs allege that APFA "manufactured a majority" and, with knowledge of the falsity of the results, wrongfully announced that John Ward had won on January 29, 2004. Plaintiffs contend that each time the erroneous results were published, or either telephonically or electronically disseminated, defendants violated the mail and wire fraud statutes.

<u>Fourth Implementing Scheme</u>

In May of 2004, allegedly in furtherance of its plans to "sanction practices in which it was already engaged without constitutional authority" and to "further the goals of the criminal enterprise," the Union Defendants proposed several amendments to the APFA constitution to its membership. The amendments sought to: (1) allow union leadership to appoint members of the Negotiating Committee; (2) grant the Board of Directors wider discretion in deciding voting procedures; (3) codify the "voter eligibility" rule that had been used in determining eligibility in the January 29, 2004 National Officer election; (4) alter the number and composition of the Balloting Committee, and (5) limit the membership's ability to initiate the process of proposing amendments

to the APFA constitution. On August 11, 2004, APFA's membership voted the amendments down. Plaintiffs claim that, although the proposed amendments were not in and of themselves criminal, they were related to pursuing the goals of the criminal enterprise. Therefore, each mailing in furtherance of the proposed amendments constituted an act of mail fraud under 18 U.S.C. § 1341.

**Pattern of Racketeering Activity**

Plaintiffs have failed to plead facts establishing a RICO pattern. Although a pattern requires only a minimum of two predicate acts, plaintiffs must also show that the predicates are (1) related and that (2) they amount to or pose a threat of continuing criminal activity. *See Schlaifer Nance & Co. v. Estate of Andy Warhol*, 119 F.3d 91, 97 (2d Cir. 1997); *United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir. 1989), cert. denied, 493 U.S. 811 (1989). Predicate acts are related if they "have the same or similar purposes, results, participants, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics, and are not isolated events." *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 240 (1989). Continuity is established by facts demonstrating either an "open-ended pattern of racketeering activity (i.e., past criminal conduct coupled with a threat of future conduct) or a closed-ended pattern of racketeering activity (i.e., past criminal conduct extending over a substantial period of time)." *See GICC Capital Corp. v. Tech.Fin. Group, Inc*., 67 F.3d 463, 466 (2d Cir. 1995).

1. Relatedness

To begin with, plaintiffs' First, Second and Third Implementing Schemes relate to the single overarching goal of inducing the flight attendants to enter into the RPA, and ensuring the continuation of the RPA. Plaintiffs' characterization of the facts as setting forth three separate schemes is artificial. *See Schlaifer Nance & Co.,* 119 F. 3d at 98 ("[C]ourts must take care to ensure

that plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.").

The Fourth scheme, which pertains to the internal governance of the Union, alleges no conduct by the Company Defendants, is unrelated to the goal of defrauding the flight attendants into ratifying the RPA and cannot be fairly viewed as a means of continuing the criminal enterprise. It therefore is not properly included in the RICO pattern. *See Schlaifer Nance & Co.*, 119 F.3d at 97 (schemes unrelated to pattern of racketeering activity where goals are unrelated to the underlying enterprise). Therefore, the Fourth scheme—and its alleged underlying predicate acts— are not properly considered in analyzing whether the continuity requirement has been met.

2. Continuity

Treating the First through Third implementing schemes as related, plaintiffs do not meet RICO's continuity requirements. "Closed-ended" continuity is demonstrated by a "series of related predicates extending over a substantial period of time" *Cofacredit S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 242 (2d Cir. 1999). The Second Circuit has indicated that a minimum of two years is required to show "a substantial period of time." *Id.* ("Since the Supreme Court decided *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229 (1989), this Court has never held a period of less than two years to constitute 'a substantial period of time'"). Thus, in this Circuit, closed-ended continuity is primarily a temporal concept, even though courts may weigh such other factors as "the number and variety of acts, the number of participants, the number of victims and the presence of separate schemes." *See GICC Capital Corp.*, 67 F.3d at 467.

The First through Third schemes extended from mid-February of 2003 through January 29, 2004, indicating that the criminal enterprise continued for approximately eleven and a half months.

(Even if the scheme could be treated as beginning in December of 2002 and continuing until action by the Department of Labor, it lasted only until mid-August of 2004, or a period of twenty months).[9] Indeed, as to the Company Defendants, who are not alleged to have participated in the Third or Fourth schemes, the enterprise lasted only from mid-February of 2003 through April 25, 2003. This falls far short of the Second Circuit's two-year minimum requirement. Plaintiffs do not dispute that their allegations do not meet the two-year requirement, but argue that the existence of multiple schemes and thousands of predicate acts of mail and wire fraud overcome this deficit. However, as noted above, plaintiffs are artificially fragmenting what is essentially one alleged criminal purpose—inducing the flight attendants to ratify the RPA—into multiple schemes. Thus, without more, merely alleging a large number of mailings and calls is insufficient to meet plaintiffs' burden. Plaintiffs' speculative assertion that discovery may establish that defendants' first predicate act occurred at least three months earlier than alleged does not overcome the deficiency of the Amended Complaint.

Plaintiffs alternatively argue that they have sufficiently pled an open-ended pattern of racketeering activity. Even if the court were to consider all four schemes to be related, plaintiffs offer no facts indicating that a threat of continuing criminal activity exists beyond the period during which the predicate acts were performed. *See DeFalco v. Bernas,* 244 F.3d 286, 323 (2d Cir. 2001).

Open-ended continuity requires an assessment of "the nature of the RICO enterprise, and of the predicate acts." *Cofacredit S.A.,* 187 F.3d at 242. Where, as here, defendants are operating

---

[9] Even if the Fourth Implementing Scheme were included, plaintiffs allege an enterprise lasting either eighteen months (from mid-February 2003 through August 11, 2004), or at most, twenty months (from-mid December 2002 through August 11, 2004). In either event, plaintiffs do not reach the two-year minimum.

legitimate businesses, plaintiffs are required to plead facts indicating that there existed the threat of continued criminal activity in furtherance of defendants' plans. *See GICC Capital Corp.,* 67 F.3d 463 at 466. For example, in *Cosmos Forms Ltd. v. Goldfinger*, 113 F. 3d 309 (2d Cir. 1997), defendants, who were salespersons in two separate companies, engaged in a scheme of inflating prices on paper orders for personal profit. The Court of Appeals found that plaintiffs met the open-ended continuity requirement because defendants had committed the unlawful acts regularly for fifteen months and only stopped because they had been caught by their respective companies. In contrast, plaintiffs here have not demonstrated such an ongoing threat of criminal activity. The alleged criminal goal, the fraudulent ratification of the RPA, was accomplished on April 25, 2003, Ward's challenger assumed office as President of APFA in mid- August of 2004, and the proposed constitutional amendments were voted down by the APFA membership on August 11, 2004. *Id.* (finding that even if alleged acts were presumed to be true, it was clear that the scheme was "inherently terminable" and thus could not have continued).[10]

**RICO Conspiracy**

Finally, plaintiffs claim that all defendants conspired to violate the substantive provisions of 18 U.S.C. 1962(c). Since plaintiffs' substantive RICO claim fails for lack of sufficient pattern allegations, the RICO conspiracy claim cannot survive. *See Cofacredit*, *S.A.,* 187 F. 3d 229, 245 (2d Cir. 1999).

---

[10] Defendants assert various other arguments in support of dismissing the RICO claims. Because plaintiffs have failed to plead a pattern of racketeering activity, it is unnecessary to separately consider any of these arguments.

## CONCLUSION

For the reasons discussed above, the Company Defendants' motion to dismiss Counts Ten, Twelve, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty one and Twenty-two is granted. The  Union Defendants' motion to dismiss is granted as to Counts Fourteen, Fifteen and Twenty-two, and denied as to Count Thirteen.


**SO ORDERED.**


***/s/ Nina Gershon***
**Nina Gershon**
**United States District Judge**


**Dated: March 28, 2006**
      **Brooklyn, New York**